[No. 4113–1–III.   Division Three.   June 29, 1982.]

THE STATE OF WASHINGTON, *Respondent,* v. RUSSELL
EDWIN WOODALL, ET AL, *Appellants.*

*Edward B. Shamek, Jr.,* for appellants (appointed counsel for appeal).

*L. Eugene Hanson, Prosecuting Attorney,* and *John S. Blonien, Deputy,* for respondent.

MUNSON, J.—Russell Woodall, Rocky Brantner, Patricia Lenoir, Mary Charpentier, and James Jackson appeal[1] their convictions for possession of a controlled substance.[2] We affirm.

Defendants appeal their controlled substance convictions alleging failure to suppress evidence, a violation of CrR 3.3, and failure timely to identify an informant.

Based on the information supplied by an informant, Klickitat County Sheriff's officers obtained warrants to search Mr. Woodall's residence and the Shifters' Motorcycle Clubhouse in Klickitat. Because the officers believed between 8 and 10 people were conducting a drug and alcohol party and fearing physical violence based on past contact and threats communicated to them, approximately 10 officers converged upon the Shifters' Motorcycle Clubhouse at approximately 9:15 p.m. on February 20, 1980. Two deputies and a state game officer approached the front door, saw an individual looking out the window at them, knocked, and announced their identity and purpose. After a pause of only 3 or 4 seconds, they entered the unlocked clubhouse. Asked why they waited such a short time, a deputy testified he knew the people inside the house had seen them approaching and feared they were arming themselves.

Upon entering the clubhouse, the officers found defend-

---

[1]Defendants were tried together upon their motion to consolidate. Defendants' appeals remain consolidated pursuant to RAP 3.3(a).

[2]All defendants were charged under RCW 69.50.401(c) with possession of marijuana in excess of 40 grams. We note the proper statute is RCW 69.50.401(d), an issue not raised by defendants. Defendants Jackson, Charpentier, Lenoir and Woodall were found guilty as charged. Defendant Brantner was found guilty of possessing less than 40 grams, a misdemeanor under RCW 69.50.401(e).

ants Brantner, Charpentier and Jackson in the living room and an ice cube tray with approximately 26 grams of marijuana was found sitting in plain view. The deputies arrested these defendants[3] and began a more thorough search. In a cedar chest inscribed with Mary Charpentier's name, deputies found a sack of marijuana seeds weighing 2.67 grams. In a back bedroom, however, deputies found approximately 78.96 grams of marijuana in a paper sack sitting on top of a dresser and another sack of marijuana weighing 25.31 grams inside the dresser.

After securing the clubhouse, the deputies drove to the Woodall residence to serve the second warrant. Here, the deputies knocked, announced their identity and purpose, waited, repeated the process, and entered only after hearing scurrying feet inside. The deputies found defendants Woodall and Lenoir in the front bedroom. After securing the home, the deputies found a miniscule amount of marijuana in the bed's headboard, a small bag in Woodall's jacket and a larger amount in a paper sack located where the informant had told them it would be. In all, the deputies retrieved approximately 164 grams of marijuana from the Woodall residence.

▆ On appeal, the defendants jointly raise four issues. They contend, first, the affidavit in support of the search warrant was insufficient under *Aguilar v. Texas,* 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509 (1964). The affidavit stated Deputy Golphenee had probable cause to believe marijuana could be found at the Shifters' Clubhouse and Woodall's residence based on:

A reliable informant who has proven to be reliable in the past has given information to Duane Golphenee that he/ she has been in the house within the last twelve hours and has personally observed marijuana being used in the

---

[3]There were other people in the clubhouse who were arrested, but not tried. For purposes of this appeal, their presence is deemed unimportant. Brantner testified he, his wife, and their small child lived in the van parked outside the clubhouse. The jury could reasonably have found that Brantner did not have access to any room in the clubhouse except the living room.

house. The informant is familiar with the appearance of marijuana.

Defendants contend this statement is a conclusion which does not provide the magistrate with enough information to measure the informant's credibility. The judge hearing the pretrial motion[4] held the statement was marginally acceptable in light of *State v. Partin,* 88 Wn.2d 899, 904, 567 P.2d 1136 (1977). There the court stated that any doubt should be resolved in favor of the validity of the warrant.

Subsequent to trial, while this case was on appeal, *State v. Fisher,* 96 Wn.2d 962, 965, 639 P.2d 743 (1982),[5] was decided and held similar affidavits met the *Aguilar–Spinelli* test, stating:

Affiant stated that the informant had given him information proven to be true and correct in the past. While this is more than drawing the conclusion that the informant is credible and admittedly less than stating the facts as to why the past information has proven to be "true and correct", it still is a factual statement—not a conclusion of the affiant. We hold in this case that it is enough to enable a neutral magistrate to determine if the informant is credible.

There is substantial authority which holds general allegations such as those before us are sufficient.

(Citations omitted.) We find no error.

Defendants next contend the officers violated the knock and announce rule, RCW 10.31.040,[6] by entering the clubhouse before someone inside affirmatively denied their admittance. This contention was answered in *State v. Jones,* 15 Wn. App. 165, 167, 547 P.2d 906 (1976):

---

[4]The judge hearing the pretrial motion did not preside at trial.

[5]In *State v. Fisher, supra* at 964, the affiant stated:

"The informant is reliable in that he/she has given information regarding drug trafficing [*sic*] and use in the past which has proven to be true and correct."

[6]RCW 10.31.040 states:

"To make an arrest in criminal actions, the officer may break ·open any outer or inner door, or windows of a dwelling house or other building, or any other inclosure, if, after notice of his office and purpose, he be refused admittance."

It is undisputed that the officers identified themselves and announced their purpose; the narrow issue is whether they were "refused admittance." There is no requirement of an affirmative refusal. *United States v. Chambers,* 382 F.2d 910 (6th Cir. 1967); *Masiello v. United States,* 317 F.2d 121 (D.C. Cir. 1963).

The defendant contends the officers did not wait a reasonable time before forcibly entering the residence. That is a factual determination to be made primarily by the trial court. *United States v. Phelps,* 490 F.2d 644 (9th Cir. 1974); *State v. Wilson,* [9 Wn. App. 909, 515 P.2d 832 (1973)] . . .

The trial court found the entry to the clubhouse reasonable in light of the information concerning the number of people at the party, danger of violence, the concern for destruction of the evidence, and the deputy's testimony that someone inside the clubhouse saw them long before they reached the door. The trial court's determination is supported by substantial evidence; we find no abuse of discretion. *State v. Patterson,* 83 Wn.2d 49, 515 P.2d 496 (1973).

Defendants next contend the trial court violated CrR 3.3(b)[7] in granting a continuance from May 20, 1980, to

---

[7]The November 17, 1978, version of CrR 3.3 was in effect at the time of trial. It stated in pertinent part:

"**(b) Time Limits.**

"(1) The time limits set forth in subsections (b)(2) and (b)(3) shall commence to run from the date: . . . (b) of the tenth day following the defendant's arrest in the event a preliminary hearing is not held or the charge is initially filed in the superior court.

". . .

"(3) A defendant who is released from custody shall be brought to trial within 90 days of the applicable event set forth in subsection (b)(1).

". . .

"(e) **Excluded Periods.** The following periods shall be excluded in computing the time for trial:

". . .

"(3) Delay granted by the court pursuant to section (f).

". . .

"(f) **Continuances.** Continuances or other delays may be granted as follows:

". . .

"(2) On motion of the state or on its own motion or on the motion of a party the court may continue the case when required in the due administration of justice and the defendant will not be substantially prejudiced in the presentation of

June 10, 1980, 110 days after arrest. Defendants contend that even if a continuance was correctly granted, CrR 3.3(g) allowed only a 5–day extension.

■ The granting or denial of a continuance rests in the sound discretion of the trial court and will be reviewed only upon a showing of manifest abuse of discretion. *State v. Eller*, 84 Wn.2d 90, 524 P.2d 242 (1974). While the prosecutor's request for a continuance was based on what the defense categorizes as prosecutorial unpreparedness, we do not reach that question. On May 18, 1980, the day before the trial judge heard the motion by telephone, the volcanic eruption of Mount St. Helens, located in southwest Washington, literally inundated the geographic area northeast of Goldendale with ash and had a paralyzing impact on communication and travel in those areas. Although Goldendale was relatively untouched by the eruption, this case had been assigned to a visiting judge from Yakima, where the ashfall stopped all activity with little evidence to indicate conditions would soon improve. Under those circumstances, and in the absence of any showing of prejudice to the defendants, the 20–day continuance was not unreasonable. *See Furlow v. United States*, 644 F.2d 764 (9th Cir. 1981).

Nor do we believe the court erred in granting a continuance which extended more than 5 days beyond the trial date. Although CrR 3.3(g) (presently CrR 3.3(d)(8)) specified extensions should be for no more than a 5–day period due to "unavoidable and unforeseen circumstances," we do not believe the Supreme Court considered volcanic eruptions when it adopted this rule.[8] As the court in *Furlow v.*

---

his defense. The court must state its reasons therefor.

"**(g) Extension of Time for Trial.** The court may extend the time in which a trial must be held for no more than five days when, because of unavoidable and unforeseen circumstances beyond the control of the court or the parties, the trial has not begun on the date set, even if the time for trial has expired, unless the defendant will be substantially prejudiced in the presentation of his defense. The court must state its reasons therefor."

[8]In *State v. Johnson*, 79 Wn.2d 173, 180, 483 P.2d 1261 (1971), the Supreme Court gave as the purpose for the speedy trial rule the need to protect defendants

*United States, supra* at 767, noted, this eruption was "an incident/accident of worldwide significance and paralyzing impact on surrounding geographies, . . ." We decline to enforce the rule because of the interruption of nature prevailing in the area at that time.

Finally, defendants contend the State violated CrR 4.7[9] by failing to provide the identity of the informant in sufficient time to allow trial preparation.

The defendants asked in their omnibus application whether the informant would testify. The State admits it would not name the informant, but contends the defendants were told his name as soon as the State decided on May 15, 1980, to use his testimony. The State also urges

against "arbitrary, oppressive, vexatious or prejudicial delays which engender an unfair trial." Moreover, our Supreme Court has repeatedly stated there can be good cause for delay except where the delay is a result of state action. *See State v. Mack,* 89 Wn.2d 788, 576 P.2d 44 (1978). Thus, we feel the import of CrR 3.3(g) (CrR 3.3(d)(8)) is to guard against prejudicial delays within the judicial framework.

[9]CrR 4.7 states in part:
"(f) **Matters Not Subject to Disclosure.**
". . .
"(2) *Informants.* Disclosure of an informant's identity shall not be required where his identity is a prosecution secret and a failure to disclose will not infringe upon the constitutional rights of the defendant. Disclosure of the identity of witnesses to be produced at a hearing or trial shall not be denied.
". . .
"(h) **Regulation of Discovery.**
". . .
"(2) *Continuing duty to disclose.* If, after compliance with these standards or orders pursuant thereto, a party discovers additional material or information which is subject to disclosure, he shall promptly notify the other party or his counsel of the existence of such additional material, and if the additional material or information is discovered during trial, the court shall also be notified.
". . .
"(7) *Sanctions.*
"(i) If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, dismiss the action or enter such other order as it deems just under the circumstances."

defendants waived error by failing to seek an "interview" with the informant in the prosecutor's office. We believe the State violated CrR 4.7(h)(2) as interpreted in *State v. Oughton*, 26 Wn. App. 74, 612 P.2d 812 (1980), by failing to pass on the informant's name and statement at the moment of discovery or confirmation.[10]

■ However, to be reversible error, defendants must show prejudice. *State v. Oughton, supra* at 79–80; *State v. DeWilde*, 12 Wn. App. 255, 529 P.2d 878 (1974). *See State v. Cunningham*, 93 Wn.2d 823, 613 P.2d 1139 (1980). A review of the informant's testimony indicates it was of marginal value to the State. On the other hand, the informant's testimony was very valuable to defendants because they were able to develop both a theory for why the marijuana was present (the informant had put it there without defendants' knowledge) and the theory of entrapment (the informant had himself sold the same marijuana to defendants). While defendants had a limited time to prepare to refute the informant's statements, the record indicates they were well prepared. There was no error.

Affirmed.

ROE, J., concurs.

MCINTURFF, C.J. (dissenting)—I must dissent from my brethren on the adequacy of the instant search warrant. More than conclusions are required before a neutral and detached magistrate can properly evaluate the affidavit. Because police informants often have an incentive to gain the police's good graces by furnishing information of dubious veracity, courts have applied stringent tests for determining whether an informant's statements establish probable cause. The majority's position does not comport with the recognized tests to validate the warrant.

---

[10]We note the prosecutor on numerous occasions defended his failure to provide requested information by referring to his "open file" policy wherein defense counsel has allegedly unlimited access. This is not sufficient under the rule, especially where, as here, the prosecutor begins trial preparation 5 days before trial.

An affidavit in support of a search warrant generally contains hearsay information, and the constitutional criterion for determining probable cause is measured by the 2–pronged *Aguilar* test. In *Aguilar v. Texas,* 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509 (1964), the Court established a standard for determining probable cause where the supporting evidence comes either wholly or partially from informants. The affidavit supporting the warrant request must meet two conditions: (1) it must describe facts which would lead a neutral magistrate to believe that the informant is a generally reliable witness; and (2) it must establish facts which would convince the magistrate that in this particular case, the informant's information is correct, and not based on unwarranted conclusions, or misobservations, by him.

In *Aguilar,* the police affidavit[11] supporting the search warrant request stated merely that a reliable informant had reported narcotics were concealed in a particular premises. The Court held that the affidavit failed to demonstrate probable cause in two respects: (1) it did not state facts which would show the magistrate that the informant was generally reliable and (2) it did not tell how the informant came upon his information.

Although the instant affidavit is more particularized, it is nonetheless defective under the *Aguilar* test. Here, the affidavit stated:

Affiant's belief is based on the following:

A reliable informant who has proven to be reliable in the past has given information to Duane Golphenee that he/she has been in the house within the last twelve hours and has personally observed marijuana being used in the house. The informant is familiar with the appearance of marijuana.

---

[11]The affidavit for the search warrant in *Aguilar* stated: "'Affiants have received reliable information from a credible person and do believe that heroin, marijuana, barbiturates and other narcotics and narcotic paraphernalia are being kept at the above described premises for the purpose of sale and use contrary to the provisions of the law.'" *Aguilar, supra* at 378 U.S. 109.

Arguably, the second prong is satisfied since the informant personally observed marijuana being used in the residence. However, I have serious doubts relating to the threshold inquiry, *i.e.,* would a neutral and detached magistrate have sufficient facts, not merely conclusions, to discern the reliability of the informant?

Although the instant affidavit indicates the informant "has proven to be reliable in the past", it provides no underlying facts from which a neutral magistrate can independently assess the informant's credibility. In 1 W. LaFave, *Search and Seizure* § 3.3 (1978), it is stated at pages 518–19:

> [A]n allegation that the affiant has previously received correct information upon a certain subject is inadequate, for it does not indicate that the informant now being relied upon was the source of that information.
>
> . . .
>
> If the furnishing of good information in the past contributes to a belief in an informant's credibility, the furnishing of bad information in the past would certainly derogate therefrom. The policeman who works with an informant knows of his full batting average, not just of his successes. If a magistrate is furnished, selectively, with half–truths, he is intellectually crippled in terms of making the informed judgment contemplated by the fourth amendment.

(Footnote omitted.) The instant affidavit is too general to establish reliability. In *United States v. Townsend,* 394 F. Supp. 736 (E.D. Mich. 1975), the court determined that characterizing someone as an "established reliable informant" was not enough. *See also Armour v. Salisbury,* 492 F.2d 1032 (6th Cir. 1974); *Byars v. State,* 259 Ark. 158, 533 S.W. 2d 175 (1976). Professor LaFave's treatise also notes the following:

> "Previously reliable informer," "informer of proven reliability," *"informer who has given accurate information in the past"*—these vague phrases hint at a consistent history of reliability, but are really *highly ambiguous.* The instances of inaccurate information may have outnumbered instances where the informa-

tion proved correct. The information may have led directly to an arrest and conviction or may only have served as a vague lead which later was verified in some particulars but not in others. * * *

The *"reliable information in the past" recital * * * lacks any factual indication of how reliable the informer is. The magistrate is, in effect, relying upon the factual determination of the arresting officer that the informer is sufficiently reliable, and not upon his own independent judicial determination.* This does not square either with the *Aguilar* demand for "underlying circumstances" or with the requirement that the essential facts supporting the assertion of probable cause be made known to the reviewing magistrate. . . . Judicial acceptance may tempt officers to make superficial averments of reliability without proper support; and some officers, while they may be above wholesale fabrication, may not be adverse to some stretching of the truth on occasion.

(Some italics mine.) 1 W. LaFave, *Search and Seizure, supra* at 516–17. *See also State v. Fisher,* 96 Wn.2d 962, 969, 639 P.2d 743 (1982) (Utter, J., dissenting).

In *Fisher* our Supreme Court recently dealt with a similar issue; however, that case is distinguishable. There, probable cause for the warrant was based on the following affidavit:

That within the past 72 hours a reliable informant, known to the affiant, has visited the above residence and while there observed LSD and marijuana.

The informant is reliable in that he/she has given information regarding drug trafficing [*sic*] and use in the past which has proven to be true and correct.

The informant has made two controlled buys to–wit: the informant was searched, given money, observed to enter and return from a residence with controlled substances purchased from within.

The informant stated that persons who live at and visit the residence are known to conceal drugs on their persons and in their vehicles. The informant further stated that the residents [*sic*], Tom Lancaster, major sources of income were the sale of drugs and stolen property.

*Fisher, supra* at 964. The majority of the court maintained reliability was supported by a factual statement indicating the past information supplied by the informant had proven to be "true and correct". Here, the instant affidavit merely noted the informant had been "reliable in the past". As previously set forth, this type of conclusionary statement does not enable a neutral magistrate to determine reliability through a factual presentation. Such a bare conclusion, without more, precludes any magistrate from drawing *his own* conclusions regarding the informant's reliability. Since the first prong of the *Aguilar* test remains unsatisfied, the warrant was invalid and the evidence seized inadmissible.

I would reverse.

Reconsideration denied August 9, 1982.

Review granted by Supreme Court January 20, 1983.